**IN THE UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

FARMERS BANK OF HAMBURG,      *
ARKANSAS      *
              Plaintiff      *
    *
VS.      *
    *         NO: 4:04CV01225  SWW
UNITED STATES DEPARTMENT OF      *
AGRICULTURE and ANN M.      *
VENEMAN, SECRETARY OF      *
AGRICULTURE      *
              Defendants      *

## ORDER

The Farmers Bank of Hamburg, Arkansas (FBH) seeks review of a final determination of

the National Appeals Division (NAD) of the United States Department of Agriculture (USDA)

upholding a decision to deny loan guarantee loss claims submitted by FBH.  Before the Court is

the administrative record, FBH's initial brief (docket entry #17), the USDA's response (docket

entry #20), and FBH's reply (docket entry #24).  After careful consideration, and for the reasons

that follow, the Court finds that the final agency decision should be upheld.

### I.  Factual Background

In 1997, tomato growers in south central Arkansas formed a grower-owned tomato

processing and marketing organization–the Hermitage Tomato Cooperative Association ("the

Co-op").   From 1998 to 1999, the FBH issued nine loans to the Co-op, totaling $9,604,860.  The

USDA guaranteed the loans for up to 90%, pursuant to the USDA Business and Industry

Guaranteed Loan Program ("B&I Program"), which is administered by the Rural Business-

Cooperative Service ("RBS").

Under the B&I Program, once a loan guarantee application is initially approved, the RBS issues a conditional commitment to the lender and borrower, which sets forth specific conditions which must be met before a final loan guarantee will be issued. *See* 7 C.F.R. § 4279.173. Coincident with or following the loan closing, the lender must provide the RBS several items as a condition to obtaining the final guarantee, including a lender certification, certifying that the conditions in the conditional commitment will be or have been met, and an executed lender's agreement. *See* 7 C.F.R. § 4279.186.

William Edward Johnson, FBH's general counsel and a member of the bank's board of directors ("BOD") since 1983, testified that the Co-op loans were among the largest in FBH's portfolio. *See* May 19, 2004 Hearing Transcript at 37. Johnson explained that state regulations limited the bank to lending a maximum of $780,000 per borrower, and absent the USDA's 90% guarantees, FBH would have been precluded from making the Co-op loans. *Id*. at 30-31.

Johnson testified that FBH's president, Dan Wingard ("Wingard"), initiated the Co-op loans by telling FBH's board of directors ("BOD") about the possibility of making a loan to the Co-op.[1]  *See* May 19, 2004 NAD Hearing Transcript at 29. According to Johnson, Wingard "came by with a full application and told us that it would be a 10 percent – that it was a 90 percent USDA guarantee loan, and gave us all of the details of it on the application and the board approved it." *Id*. at 29-30. According to Johnson's testimony, Wingard was the "main loan officer" and "main contact" with Randy Clanton, the Co-op's principal founder, president, and manager. *Id*. at 38-39. Johnson testified that Wingard would "go over to Hermitage and see

---

[1]Johnson testified: "Dan Wingard had previously been a banker in Bradley County and know some of the people over there, and just in the course of some of his contacts. He came over one day and told us about the possibility of a loan, a HTCA [Co-op] loan we call it." May 19, 2004 NAD Hearing Transcript at 29.

what was going on [at the Co-op]" and report back to the bank's executive committee.  *Id*.

The Co-op loans were issued in 3 phases, hereinafter referred to as "Phase I, Phase II, and Phase III.  Phase I loans, totaling $3,000,0000, closed in March 1998.  The Co-op sustained losses for the 1998 growing season, which it attributed to factors beyond its control, such as crop losses caused by power outages and lack of refrigeration and lack of packing facilities.

The Co-op sought Phase II loan money for the purpose of expanding existing Co-op facilities and constructing additional packing facilities.  Phase II loans, totaling $1,850,000, closed in March 1999.   The 1999 tomato crop was poor, and the Co-op suffered another loss.  After the 1999 tomato growing season,  but before the FBH obtained audited financial statements for the Co-op's 1999 fiscal year, the Co-op approached FBH about a third  loan package that would enable it to expand its operations to include a  farm supply store and a convenience store that would operate year round.

On December 13, 1999, while an application for USDA guarantees on the Phase III loans was pending, Wingard wrote the RBS a letter stating that the Co-op was delinquent, in the amount of $447,701, on payments for loans disbursed in Phases I and II.  AR at 000325.  Wingard's letter states, "We understand the Co-op has made arrangements to make three delinquent payments totaling $447,701.29 within the next few days."  *Id*.

The USDA informed FBH that it would deny Phase III guarantees unless the Co-op could make its annual payments for loans received in Phases I and II.  *See* docket entry #17, at 4; *see also* May 20, 2004 Hearing Transcript at 104 (Yancey testimony).   Shirley Tucker, a RBS employee who participated in the administration of the Co-op guarantees, testified that she assumed the Co-op would resolve its delinquency with proceeds collected from its accounts receivable.  *See* May 19, 2001 Hearing Transcript at 117-119.

On December 20, 1999, the Co-op's bank account had a balance of $9,467.  AR 000481. On December 21, 1999, the Co-op deposited $450,480 into the account, consisting of a $300,000 check from the Co-op's law firm and three checks totaling $150,480 from Paul Teague.  AR 000484.  FBH describes the checks deposited on December 21 as "bridge loans" intended to "tide [the Co-op] over . . . until Phase III."  Docket entry #17, at 10-11.  It is undisputed that the Co-op used the funds it deposited on December 21, 1999 to pay the annual debt on the delinquent Phase I and II loan notes.  AR 000485-486.

Also on December 21, 1999, FBH finalized the $4.75 million Phase III loan agreements and credited $622,775.89 in loan proceeds to the Co-op's bank account.  As a condition to receiving the USDA's conditional commitment for Phase III guarantees, FBH submitted a lender's certification to the USDA, dated December 21, 1999, stating that there had been no material adverse change in the Co-op's financial condition.  AR 000052-53.   The same day, the USDA issued a conditional commitment to guarantee the Phase III loans, which gave the Co-op 1 year to meet conditions set forth in the commitment.  AR 000044, 000484.

After the Co-op received the Phase III loan proceeds, it repaid the aforementioned "bridge loans" which had enabled the Co-op to become current on its Phase I and II loans.   AR 000468, 000491.   It is undisputed that the Co-op repaid the bridge loans, in part, with Phase III loan proceeds.

USDA regulations required that FBH submit the Co-op's audited financial statements within 120 days after the close of the Co-op's fiscal year.  FBH did not receive the  Co-op's audited financial statements for the 1999 fiscal year until February 2000–160 days after the Co-op's August 31 fiscal year end.  The statements showed an loss of $750,000.  Additionally, they revealed that the Co-op was not in compliance with several loan covenants, which were required

as a condition to USDA guarantees, including: (1) a minimum asset/liability ratio of 1.5 to 1 (the financial statements showed a 1.3 ratio); (2) minimum accounts receivable or cash-on-hand of $1,500,000 (the financial statements showed a total of $1,092,038; and (3) a minimum 10% tangible balance sheet equity (the financial statements showed a 5.09% tangible balance sheet equity).  AR 001608-1609.

Johnson gave the following testimony regarding FBH's BOD's reaction to seeing the audited financial statements:

> We went ballistic.  We were very upset.  A some point in time right in there we began . . . we began talking to Dan Wingard about this is your baby, not meaning it was his total responsibility, but we wanted him over there everyday, if necessary, just whatever it took to make sure that . . . thing got straight.

May 19, 2004 Hearing Transcript  at 48.  Johnson also stated that it was an "understatement" to say that the bank was not aware of the Co-op's financial condition when it closed the Phase III loans.  *Id*. at 47.

The 2000 tomato crop was poor, and by November 2000 the Co-op's unaudited financial statements showed a loss of approximately $1.5 million.  *See* docket entry #17 at 5.  On November 28, 2000, Wingard requested that the RBS extend the Co-op's 1-year deadline, set to expire December 21, 2000, to meet the conditions set forth in the USDA's conditional commitment for guarantee the Phase III loans.  AR 001122.  Wingard stated that the Co-op could not meet the conditions because construction of the farm supply store and convenience store had not been completed and that "some of the minimum criteria" set forth in the conditional commitment could not be met due to the Co-op's losses.  *Id*.

On January 3, 2001, the last day of Wingard's employment at FBH,[2] he wrote the USDA

---

[2]In its initial brief, FBH states January 3, 2001 was the day of Wingard's retirement. Docket entry #17, at 5.

and requested that the agency issue the Phase III guarantees. AR 000131.   Wingard represented

to the USDA that the Co-op met all conditions of the conditional commitment with the exception

of the 10% equity position requirement,[3] and he requested that the USDA waive that

requirement.  *Id*.  He also requested that the USDA "restore" $580,348 of the Co-op's working

capital from Phases I and II.[4]

According to Johnson, when FBH closed the Phase III loans, BOD members actually

thought the loans were guaranteed and did not realize the USDA had only issued a conditional

commitment to guarantee the loans.  *See* May 19, 2004 Hearing Transcript at 64.  Johnson

testified that closing the loans without the guarantees put the bank $4 million over its state-

imposed lending limit, motivating the bank to do "everything [it] could" to obtain the Phase III

guarantees.  *Id*. at 65.

The USDA denied the Co-op's  request for restoration of $580,348 in working capital,

but agreed to guarantee the Phase III loan notes if the Co-op could raise $580,000.  In February

2001, FBH and another bank loaned the Co-op $580,000, and the USDA issued the Phase III

90% guarantees.

In 2001, the Co-op suffered its fourth, consecutive loss and was unable to make any

payment toward its Phase III debt.  In August 2001, the USDA instructed FBH to submit a

liquidation plan for the Co-op, and to file estimated loss claims.  FBH hired an independent

accounting firm, Jeffrey, Phillips, Mosley & Scott, P.A. ("JPM&S"), to investigate the Co-op's

---

[3]The Co-op, in fact, had a negative equity position.

[4]In its initial brief, FBH states that when Wingard wrote the letter, " the [convenience]
stores were built but there was not enough working capital to stock them, it having been used for
loan payments among other expenses.  The Co-op had previously requested of the agency that
the Bank be allowed to restore the working capital from Phase I that had been repaid, in an
amount of approximately $568,000."  Docket entry #17, at 5.

finances and activities.  In a report dated September 20, 2002, JPM&S  issued "initial

observations" which revealed that from 1998 to 2001, approximately $6 million of the Co-op's

working capital had been mismanaged in a manner that directly benefitted Co-op members and

depleted funds available to pay loan debt.  *See* AR 000618-627, *see also* AR 000032-33 (table

summarizing diverted funds).

The JPM&S report states for the years ended August 31, 1999 and 2000, Co-op member

contributions came in the form of capital notes receivable totaling approximately $1.3 million,

which were used as collateral for the Co-op loans.  AR 000366.  The report states that a portion

of the notes had been written off, and a portion was past due.  *Id*.  Additionally, the JPM&S

report contains numerous instances in which the Co-op made payments to members in violation

of policies and procedures required under the USDA's conditional commitments for Co-op loan

guarantees.[5]

On December 18, 2002, FBH submitted  $7,442,317.70 in loss claims to the USDA:

$1,858.294.45 for Phase I losses,  $1,210.528.60 for Phase II losses, and $4,375,494.65 for Phase

III losses.

On December 19, 2002, FBH commenced a civil lawsuit in the  Circuit Court of Ashley

County, Arkansas against Wingard , Clanton, the Co-op's board of directors, and the Co-op's

accountants.  In its complaint, FBH charged the defendants with fraud, conspiracy, and RICO

violations.  *See* AR 000329-349.  FBH alleged that Wingard violated his fiduciary duties to

FBH, claiming that  "[u]nknown to the directors of [FBH] . . . Wingard abdicated his . . .

---

[5]The conditional commitments include a condition that each Co-op member sign an agreement that "if there is a shortfall of funds available to pay debt service, they forego distributions of proceeds . . . on a pro-rata basis to the extent necessary to provide adequate funds for the Cooperative to meet its annual debt service."  AR 000050, 001593.

responsibilities as President . . . and entered into and became an essential part of the civil conspiracy . . . to defraud [FBH] and [the] USDA[,] becoming not an agent of Plaintiff but an agent of the civil conspiracy to defraud."   AR 000332.

FBH further alleged that when it closed the Phase III loans, Wingard and the other named defendants used bridge loans to conceal the fact that the Co-op failed to meet USDA requirements.  The complaint states in pertinent part as follows:

> Immediately after Phase III of the loan was closed, the loan proceeds were used in part to repay [the bridge loans], there was actually no adequate capitalization, though through overt deception, in order to deceive [FBH], the appearance of adequate capitalization had been created in the manner stated.  In truth and in fact, [the Co-op] did not meet either the asset to liability ratio or the 10% capital requirement when said loan was closed, but Farmers Bank was never told about those arrangements or the shortage of funds, and the loan was closed on December 21, 1999 . . . . *All of said Defendants* conspired . . . to fraudulently conceal from [FBH] the financial condition of [the Co-op] and the inability of [the Co-op] to meet the loan conditions . . . .

AR 000331-332 (emphasis added).

FBH claimed that the defendants it sued in state court fabricated assets that served as collateral for the Co-op loans and paid Co-op members in violation of loan provisions:

> Capital Notes signed by [Co-op members] in the total amount of approximately $1.3 Million Dollars were assigned to [FBH] as part of its collateral; [s]ubstantially all of those Capital Notes are in default, with an approximate balance due on them of $1.1 Million Dollars.  Defendants did not obtain Financial Statements from the members who gave those notes, and numerous members were advised by [the Coop] and their attorneys, to set up dummy corporations and let the corporations give those notes, even though the corporations had no assets.  A majority of those notes were worthless as a result of a conspiracy . . . to create a false and non-existent appearance of capital.  By artificially increasing capital, the [Co-op] principals attempted to fraudulently give the appearance of meeting the loan covenants. In addition to those notes, the Cooperative made cash advances to members for labor and growing expenses, and carried those cash advances on its books as accounts receivable. Those receivables also were assigned to Farmers Bank as part of its collateral.  Those receivables were to be paid by marketing of tomatoes through the Cooperative, with the account of the member to be satisfied before any amounts of sale proceeds were distributed to the members.  Further, crop insurance proceeds were to be applied against member accounts.  The audit work papers reflect that the [Co-op's] accounting firm] made eighteen adjusting journal entries for the year ending 8/31/98,

and thirty-three adjusting journal entries for the year ending 8/31/99, thereby manipulating the books . . . and resulting in writing off amounts due to the Cooperative on the grower accounts, and therefore due to [FBH]. No crop proceeds were to be distributed to members until their accounts were paid in full. However, the grower members were credited with their share of the 1999 crop proceeds as of 7/19/99, and cash distributions were calculated as of that date. Subsequently, accounts receivable on the sale of tomatoes to outside parties totaling $176,000 were written off to expense as uncollectible, but [the Co-op's accounting firm] did not add those back on the grower member accounts. Further, of $442,000 received in March 1999 for crop insurance on the 1998 crop, approximately $310,000 was fraudulently distributed by [Co-op] principals in cash to the grower members despite the fact that the grower accounts receivable . . . approximated $332,000. Those distributions violated the loan conditions, and all of those distributions and adjusting entries were the result of a conspiracy between the Defendants.

AR 000333-334.

On July 23, 2003 the USDA Office of Inspector General ("OIG") issued an audit report,[6] recommending that the USDA "take action to contest the guarantees, or substantially reduce the remaining balance of the loan not guarantees totaling $6,993,578." AR 000009. The audit report summarizes the OIG's findings as follows:

We found that the lender misrepresented key financial information and inadequately serviced the loan. The lender's actions contributed to the ultimate failure of the cooperative. Specifically, we found that the lender:

• Processed guaranteed loans to an ineligible borrower,

• allowed the borrower to use guaranteed funds to pay delinquent federal debt,

• allowed the borrower to use guaranteed loan funds for unauthorized purposes,

• failed to adequately supervise the construction of the borrower's facilities, and

• allowed the borrower to divert funds away from the cooperative.

_____

[6]*See* May 29, 2004 Hearing Transcript at 91-94, testimony of Bruce Carson. Bruce Carson, an auditor with the USDA OIG, testified that the RBS requested an audit of the Co-op loans in May 2000, but the OIG denied the request due to a lack of department resources and staffing. *Id*. The RBS made a second audit request in October 2002. *Id*.

AR 000015.

On August 29, 2003, the USDA denied FBH's loss claims, citing the following reasons for the denial:

- Negligent servicing that contributed to the diversion of over $6 million in loan proceeds.

- Processing Phase III loans for an ineligible borrower.

- Concealing delinquent federal debt.

- Permitting the unauthorized use of guaranteed loan funds.

- Failure to monitor construction of Co-op facilities.

AR 000638-640.

FBH appealed to the NAD.   On September 16, 2004, after a three-day hearing and receiving evidence, the NAD Hearing Officer issued an appeal determination, upholding the USDA's decision.  AR000649-656.

## II.  Pertinent Contract and Regulatory Provisions

On March 19, 1998, FBH entered a lender's agreement as a condition for obtaining the loan guarantees at issue in this appeal.  AR 000036.  The agreement states, in part, as follows:

> The Loan Note Guarantee will be unenforceable by the Lender to the extent any loss is occasioned by violation of usury laws, negligent servicing, or failure to obtain the required security regarding of the time at which the USDA acquires knowledge of the foregoing.  Any losses will be unenforceable by the Lender to the extent that loan funds are used for purposes other than those specifically approved by USDA in its Conditional Commitment for Guarantee.  Negligent servicing is defined as the failure to perform those services which a reasonably prudent Lender would perform in servicing its own portfolio of loans that are not guaranteed.  The term includes not only the concept of failure to act but also not acting in a timely manner or acting in a manner contrary to the manner in which a reasonably prudent Lender would act up to the time of loan maturity or until a final loss is paid.

AR 000037.

The lender's agreement provides that FBH's servicing responsibilities include, but are not limited to the following:

> Obtaining compliance with the covenants and provisions in the note, loan agreement, security instruments, and any supplemental agreements and notifying in writing the USDA and the Borrower of any violations. . . .  Obtaining from the Borrower periodic financial statements required in the loan agreement with the borrower.  At a minimum, annual financial statements must be forwarded by the lender, with a credit analysis, to the USDA servicing office within 120 days of Borrower's fiscal year end.

AR 000039.

Title 7, Parts 4279 and 4287 of the Code of Federal Regulations set forth the regulations applicable to B&I loan guarantees.  The regulations give private lenders primary responsibility for the successful delivery of the B&I loan program.  All lenders obtaining or requesting a B&I loan guarantee are responsible for servicing guaranteed loans in a prudent manner, including liquidation if necessary.  *See* 7 C.F.R. § 4279.30(a)   The regulations provide:

> The lender is responsible for servicing the entire loan and for taking all servicing actions that a prudent lender would perform in servicing its own portfolio of loans that are not guaranteed. *The Loan Note Guarantee is unenforceable by the lender to the extent any loss is occasioned by violation of usury laws, use of loan funds for unauthorized purposes, negligent servicing, or failure to obtain the required security interest regardless of the time at which the Agency acquires knowledge of the foregoing.* This responsibility includes but is not limited to the collection of payments, obtaining compliance with the covenants and provisions in the Loan Agreement, obtaining and analyzing financial statements, checking on payment of taxes and insurance premiums, and maintaining liens on collateral.

7 C.F.R. § 4287.107(emphasis added).

The regulations define "negligent servicing" as follows:

> The failure to perform those services which a reasonably prudent lender would perform in servicing (including liquidation of) its own portfolio of loans that are not guaranteed. The term includes not only the concept of a failure to act, but also not acting in a timely manner, or acting in a manner contrary to the manner in which a

11

reasonably prudent lender would act.

7 C.F.R. § 4279.2

Regarding a lender's duty to obtain and analyze financial statements, the pertinent

regulation provides:

> The lender must submit annual financial statements to the Agency within 120 days
> of the end of the borrower's fiscal year.  The lender must analyze the financial
> statements and provide the agency with a written summary of the lender's analysis
> and conclusions, including trends, strengths, weaknesses, extraordinary transactions,
> and other indications of the financial conditions of the borrower.

7 C.F.R. § 4287.107(d).

### III.  Standard of Review

In accordance with the standard of judicial review set forth in the Administrative

Procedures Act (APA), the Court must uphold the final decision of the NAD  unless it was

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or

unsupported by substantial evidence.  *See* 5 U.S.C. § 706(2)(A),(E).  A decision is arbitrary and

capricious if:

> the agency has relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered an explanation
> for its decision that runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or the product of
> agency expertise.

*Central South Dakota Co-op. Grazing Dist. v. Secretary of U.S. Dept. of Agriculture* 266 F.3d

889, 894-95 (8th Cir. 2001)(quoting  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*

463 U.S. 29, 43 (1983)).  "'Substantial evidence' is more than a scintilla but less than a

preponderance of the evidence; it is 'such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'"  *University of Iowa Hospitals and Clinics v. Shalala*, 180

F.3d 943, 954 (8ᵗʰ Cir. 1999)(quoting *Donaho v. FMC Corp*., 74 F.3d 894, 900 n. 10 (8th Cir.1996)).

The scope of review is narrow and a court is not to substitute its judgment for that of the agency.  "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs*., 463 U.S. at 43(quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).  While a court may not supply a reasoned basis for agency action that the agency itself has not given, a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc*. 95 S. Ct. 438, (1974).

## IV.  Discussion

The NAD Hearing Officer found that FBH was negligent in servicing the Co-op loans,[7] and he upheld the USDA's denial of FBH's total loss claim of $7,442,317.70, which includes a $1,858.294.45 loss on Phase I loans, a $1,210.528.60 loss on Phase II loans, and a $4,375,494.65 loss on Phase III loans.  FBH argues that the NAD's determination was arbitrary and capricious because the Hearing Officer made no attempt to quantify the effect of the bank's  negligent servicing.

The NAD Hearing Officer found, among other things, that FBH failed in its servicing obligations by neglecting to obtain and analyze audited financial statements.   Further, he found that if FBH had monitored the Co-op's transactions as required by its lenders' agreement and

---

[7]The Hearing Officer also found that FBH allowed the Co-op to used Phase III loan funds for unauthorized purposes–namely, to pay off bridge loans used to bring Phase I and II loans current--and failed in its duty to supervise construction of Phase III construction projects.

USDA regulations, it would never have issued the Phase III loans.[8]   Accordingly, the Hearing

Officer made an implicit finding that Phase III loan losses totaling $4,375,494.65 were a direct

result of FBH's negligence.

FBH argues: "If it was such negligence to close Phase III without the audit . . . how could

the [USDA Phase III] guaranty issue in good faith?"   But the issue here is whether there is

substantial evidence to support the NAD's finding that the $475,495.65 loss on Phase III loans

was occasioned by negligent servicing, regardless of when the USDA discovered the violation or

whether the USDA issued its guarantees in good faith.  *See* 7 C.F.R. § 4279.30(a)("The Loan

Note Guarantee is unenforceable by the lender to the extent any loss is occasioned by . . .

negligent servicing . . . regardless of the time at which the Agency acquires knowledge of the

foregoing.").

FBH argues that it was reasonable to close the loan before receiving audited financial

statements because, the Co-op was "an existing customer who was current on its debt service."

Docket entry #17, at 21.  To the contrary, it is undisputed that the Co-op was in default as of

December 13, 1999.  Furthermore, the evidence shows that FBH failed to take prudent measures

to ensure the Co-op's creditworthiness.  The rule found at  7 C.F.R. § 4270.30(b) states:

> Credit evaluation.  This is a key function of all lenders during the loan processing
> phase.  The lender must analyze all credit factors associated with each proposed loan
> and apply its professional judgment to determine that the credit factors, considered

---

[8]The Hearing Officer noted precisely what FBH formally alleged in the Circuit Court of Ashley County:  that FBH would not have closed the Phase III loans if it had known of the Co-op's 1999 income loss, set forth in the audited financial statements which FBH did not obtain until February 2000.   Although FBH's allegations in state court do not constitute binding judicial admissions, "they are admissible evidence that can be weighed like any other admission against interest of [FBH]" *First Bank of Marrietta v. Hogge*, 161 F.3d 506, 510 (8th Cir. 1998)(citation omitted).

in combination, ensure loan repayment. *The lender must have an adequate underwriting process to ensure that loans are reviewed by other than the originating officer.*

7 C.F.R. § 4270.30(b)(emphasis added).

According to Johnson's testimony, Wingard served as the originating loan officer for the Co-op loans, and there is no evidence that a bank officer, other than Wingard, analyzed the Co-op's credit factors to ensure loan repayment.   A "Lender's Credit Analysis" dated January 15, 1999, signed by Wingard on behalf of FBH, states that a review of the Co-op's "projected financial statements" for the next three years indicates the ability to "cash flow debt repayments on the proposed loans."   AR 001547(emphasis added).   The bank's complaint filed in state court, charging that Wingard took part in a scheme to give the false appearance that the Co-op was creditworthy, supplies additional evidence that the bank employed imprudent underwriting procedures with respect to the Co-op loans.[9]

FBH argues that "the earliest indication the Bank had the Co-op loans might need more attention was when payments on two . . . loans became overdue in December 1999."   Docket entry #17, at 10.   According to FBH, at that point, it did what a prudent lender would do, "it confirmed that arrangements had been made by the Co-op to cover the payments."   *Id*.   However, the "arrangements" consisted of bridge loans, which the Co-op would repay with Phase III loan proceeds.   Had the bank been acting as a prudent commercial lender, without the buffer of 90% USDA guarantees,  it would have rejected such an arrangement and reevaluated its decision to

---

[9]FBH cannot defend its negligent servicing by claiming, as it did in state court, that Wingard breached his fiduciary duties to the bank.   AR 000332.   The Hearing Officer determined that FBH bears responsibility for Wingard's actions, and the Court agrees.   FBH's board of directors provided Wingard the power authority to act for the bank with respect to the Co-op loans.

lend a failing enterprise more money.[10]

The Hearing Officer also articulated rational bases for upholding the decision to deny FBH's loss claims for Phases I and II.  He reasoned that, if FBH had properly monitored the Co-op's transactions by obtaining and carefully analyzing audited financial statements, it would have recognized a clear pattern of losses and mismanagement that began in 1998.  The pattern of Co-op losses and mismanagement is well documented.  The JPM&S report, the OIG report, and FBH's pleading filed in state court identify transactions from 1998 to 2001 in which approximately $6 million of the Co-op's working capital was mismanaged, often in violation of loan provisions, leaving inadequate funds to pay the Co-op's loan debt.  *See* AR 000618-627, AR 000032-33, AR 000329-343.  Such transactions include the Co-op's failure to charge members the full cost of processing for three consecutive years, which lost the Co-op $2,569,000;  paying Co-op members' crop insurance premiums, in violation of loan provisions; and writing off accounts receivable, without explanation.  AR 000655.

FBH asserts that when it finally learned about the Co-op's financial problems it "indeed did upgrade the attention [the] loans were to receive by assigning them to the personal, and principal, responsibility of its president [Wingard], who was also its most experienced loan officer."  Docket entry #17, at 13.   However, the Hearing Officer could reasonably conclude that, once the BOD realized that the Co-op was in financial distress, it was *imprudent* to give Wingard, the officer who had originated and serviced the loans and served as the bank's "main contact" with the Co-op, even more oversight authority.

---

[10]According the allegations FBH made in state court, instead of reevaluating the Co-op's creditworthiness, Wingard engaged in a scheme to make it appear as though the Co-op could pay its debts.  AR 000338.

Had FBH monitored the Co-op's transactions in a reasonable and prudent manner, it would have recognized the Co-op's serious problems and taken action to reduce losses.  As the Hearing Officer aptly stated: "Appellant had a responsibility to ensure these problems did not continue from year to year.  It is not to say that Appellant could have prevented Co-op financial problems, but proper servicing and oversight would have substantially reduced financial losses to both Appellant and RBCS."  AR 000655.

The Court finds that substantial evidence in the administrative record supports the Hearing Officer's finding FBH failed, in several respects, in its obligation to service the Co-op loans in a prudent manner, and that the bank's losses on Phase I, II, and III loans were occasioned by negligent servicing.  The Court further finds that the ruling of the NAD, upholding the USDA's denial of FBH's loss claims, was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to the law.

IT IS THEREFORE ORDERED that the final determination of the NAD is AFFIRMED. This action is dismissed pursuant to the judgment entered together with this order.

IT IS SO ORDERED THIS 20TH DAY OF APRIL, 2006.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE